UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARY ELLEN HANRAHRAN, | ) | |
| Plaintiff, | ) | |
|  | ) | Civil Action No. 14-10397-PBS |
| v. | ) | |
|  | ) | |
| SPECIALIZED LOAN SERVICING, LLC | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

October 23, 2014

Saris, U.S.D.J.

Plaintiff Mary Ellen Hanrahran alleges that Defendant Specialized Loan Servicing, LLC ("SLS") violated her rights under Mass. Gen. Laws c. 93A by engaging in a pattern of delay and evasion in response to her attempts to obtain a loan modification under the Home Affordable Modification Program ("HAMP"). After hearing, this Court previously allowed SLS's motion to dismiss Hanrahran's complaint (Docket No. 19). Hanrahran filed an amended complaint (Docket No. 20) and SLS now moves to dismiss again. SLS's Motion to Dismiss the Amended Complaint (Docket No. 23) is **DENIED**.

**I. FACTUAL BACKGROUND**

The alleged facts are taken as true for purposes of this motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009).

In November 2006, Hanrahran obtained a loan for $100,800 from Countrywide Home Loans, Inc. ("Countrywide"), which was secured by a mortgage on her home in Brockton, Massachusetts. Am. Compl. ¶ 3. Specialized Loan Servicing, LLC, ("SLS") became the servicer of Hanrahran's loan in January 2012 and sent her a Notice of Intention to Foreclose in March 2012. Id. at ¶¶ 4,6.

**A. Hanrahran's October 2012 Request for Mortgage Assistance under the Home Affordable Modification Program ("HAMP")**

Several months after receiving SLS's notice of foreclosure, Hanrahran received a letter from SLS informing her that she qualified to apply for the Home Affordable Modification Program ("HAMP"), a national initiative aimed at modifying loans to reduce a homeowner's monthly payments and avoid foreclosure.[1] Id. at ¶ 7. Hanrahran is a HAMP-eligible homeowner because her home in Brockton is her principal residence, her mortgage originated prior to January 1, 2009, and she owes less than $729,000 on her mortgage. Id. at ¶¶ 10-11. Additionally, SLS is a HAMP-participating servicer, mandated to comply with the program's requirements in evaluating requests for mortgage assistance submitted by homeowners. Id. at ¶ 13.

Seizing this opportunity to avoid foreclosure, Hanrahran submitted the necessary documents to SLS to commence the HAMP

---

[1] For additional background information about HAMP, see Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 228-29 (1st Cir. 2013), and the cases cited therein.

2

process in September 2012 and filed her official HAMP Request for Mortgage Assistance in October 2012. Id. at ¶¶ 19-20. Based on her gross monthly income and monthly mortgage payment at the time, Hanrahran was entitled under HAMP to a reduction in her mortgage payment from over $1100/month to approximately $775/month. Id. at ¶ 22. On November 5, 2012, SLS confirmed receipt of Hanrahran's HAMP request, informed her that she did not need to submit any additional documentation, and reassured her that the company was in the process of making a decision. Id. at ¶ 21.

Even though HAMP regulations require a loan servicer to evaluate a homeowner's application within 30 days, SLS did not contact her concerning the status of her application between November 2012 and April 2013. Id. at ¶¶ 21-24. Meanwhile, SLS continued to charge thousands of dollars in costs, fees, and interest, adding them to the balance of her mortgage. Id. at ¶ 23. By April 22, 2013-six months after she had submitted her HAMP request-Hanrahran still had not heard back about the status of her application. To her surprise, Hanrahran was instead told again that her mortgage was in default and being referred to foreclosure by SLS. Id. at ¶ 24.

In response, Hanrahran sent SLS a written demand for relief pursuant to Mass. Gen. Laws ch. 93A on May 4, 2013. Id. at ¶ 25. A month later, SLS sent Hanrahran a letter informing her that she

3

did not qualify for a National Mortgage Settlement modification because SLS could not create an affordable payment without changing the terms of the loan. Id. at ¶ 26. But SLS still did not give Hanrahran an answer regarding her October 2012 request for HAMP relief, despite repeated requests to do so. Id.

**B. Hanrahran's February 2014 Application for Loan Modification**

Hanrahran again attempted to obtain loan relief from SLS in 2014. In January 2014, SLS sent Hanrahran a letter informing her of her right to request a modified mortgage loan. Id. at ¶¶ 27-28. Attached to the letter was a loan modification application, which Hanrahran completed and submitted with supporting documentation on February 12, 2014. Id. at ¶¶ 27-29.

SLS responded to her application two months later in April 2014, stating that she was not evaluated for various mortgage relief programs, including HAMP, because she had failed to provide certain required documents. Id. at ¶¶ 30-33. The letter also stated that SLS had told her more than a month previously that certain documents were needed to process the application. Id. at ¶ 31. But no such notice was ever sent by SLS. Id. at ¶ 32. And more to the point, Hanrahran had submitted all of the necessary documents for SLS to evaluate her application. Id. at ¶ 29. Meanwhile, SLS continued to add thousands of dollars in costs, fees, and interest to her mortgage. Id. at ¶ 34.

On June 26, 2014—more than a year and a half after Hanrahran

4

initially requested HAMP relief in October 2012-SLS finally informed Hanrahran that her request for a HAMP modification was denied. Id. at ¶ 35. SLS falsely stated, however, that it denied her request for a loan modification because it would result in a reduction of less than 10% in her monthly mortgage payment. Id. To the contrary, a HAMP modification would have reduced the interest rate on Hanrahran's mortgage rate from 5% to as little as 2%, which would result in a monthly payment reduction of far more than 10%. In any event, SLS offered Hanrahran a Standard Trial to Modification Program adjustment, with a monthly payment of $1,128.85, which at this point was higher than her monthly payment in October 2012, when she first applied for a HAMP modification. Id.

Hanrahran alleges that SLS's actions since October 2012 have left her "with the choice between paying an increased monthly mortgage payment to SLS or losing her home to foreclosure, plus damage to her credit, loss of time, accumulation of interest, and assessment of late payment charges and other costs." Id. at ¶ 36. She seeks monetary damages against SLS for unfair and deceptive practices in violation of Mass. Gen. Laws ch. 93A; temporary, permanent, and final injunction enjoining SLS from commencing the foreclosure process against her; specific performance of a loan modification; and the costs of this action, including fees and costs of experts, attorneys' fees, and treble damages in

accordance with Chapter 93A. Pl.'s Am. Compl., at 6-7. Meanwhile, SLS moves to dismiss Hanrahran's complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

## II. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must "possess enough heft" to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). "A case has 'facial plausibility' when plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "Plausible, of course, means more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] 'to draw on' [its] 'judicial experience and common sense.'" Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (quoting Iqbal, 556 U.S. at 679).

Dismissal for failure to state a claim is appropriate where pleadings fail to set forth factual allegations respecting each element necessary to sustain recovery under a legal theory. Gagliardi v. Sullivan, 513 F.3d 302, 304 (1st Cir. 2008). In considering the adequacy of the pleadings, the Court accepts all factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. Schatz, 669 F.3d at 55.

6

**III. DISCUSSION**

To allege a violation of the Massachusetts Consumer Protection Act ("Chapter 93A"), a plaintiff must show that the defendant engaged in trade or business and committed an unfair or deceptive practice, causing economic injury to the plaintiff. <u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 552 F.3d 47, 69 (1st Cir. 2009) (citing Mass. Gen. Laws c. 93A § 2). SLS argues that Hanrahran's complaint is deficient because it does not sufficiently allege: (1) an unfair or deceptive practice committed by SLS; or (2) economic injury. Both of these arguments miss the mark.

**A. Unfair or Deceptive Business Practice**

First, Hanrahran's amended complaint sufficiently alleges that SLS engaged in unfair or deceptive business practices in the processing of her HAMP application. Admittedly, Massachusetts lacks a precise test for determining when conduct crosses the line to become unfair or deceptive for purposes of Chapter 93A. <u>Kattar v. Demoulas</u>, 739 N.E.2d 246, 257 (Mass. 2000) (explaining that defining "unfair or deceptive" would be "impossible" because "there is no limit to human inventiveness in this field" (quotation marks omitted)). "Violation of a statute is not a necessary element of a Chapter 93A claim, as the consumer protection law creates new substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the

7

common law or any prior statute." Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013) (quotation marks omitted).

In any event, Massachusetts courts have laid out a number of helpful guideposts for determining when conduct is deceptive or unfair for purposes of Chapter 93A. For example, conduct is "deceptive" when "it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently than they otherwise would have acted." Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 488 (Mass. 2004). Similarly, to determine whether conduct is "unfair" for purposes of Chapter 93A, courts consider several factors: (1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen). Mass. Eye & Ear Infirmary, 552 F.3d at 69. Courts must also "evaluate the equities between the parties." See Jasty v. Wright Medical Tech., Inc., 528 F.3d 28, 38 (1st Cir. 2008) (quoting Swanson v. Bankers Life Co., 450 N.E.2d 577, 580 (Mass. 1983)). Both the defendant's and the plaintiff's conduct, knowledge, and what they should have reasonably known may be factors in determining whether an act or practice is unfair. Id. Ultimately, "Massachusetts leaves the determination of what

constitutes an unfair trade practice to the finder of fact, subject to the court's performance of a legal gate-keeping function." Mass. Eye & Ear Infirmary, 552 F.3d at 69.

Applying these principles to Chapter 93A claims involving HAMP, courts have held that a bank's handling of efforts to obtain a home loan modification can be independently actionable under Chapter 93A, but only when the conduct is an unfair or deceptive business practice in and of itself. See Dill v. Am. Home Mortg. Servicing, Inc., 935 F. Supp. 2d 299, 306 (D. Mass. 2013) (Chapter 93A claim for misleading plaintiffs regarding criteria for HAMP modification and status of their modification application); Kozaryn v. Ocwen Loan Servicing, LLC, 784 F. Supp. 2d 100, 102-03 (D. Mass. 2011) ("A violation of HAMP that is unfair or deceptive in and of itself could, therefore, create a viable claim under Chapter 93A even though HAMP does not provide a private cause of action."); see also Young, 717 F.3d at 240 ("Young's Chapter 93A claim . . . includes defendants' handling of her entire case, beginning with the negotiations surrounding her forbearance agreement through her attempts to obtain a permanent loan modification.").

As a result, plaintiffs must allege "more than mere technical violations and clerical errors to support a Chapter 93A claim predicated on HAMP violations." Okoye v. Bank of N.Y. Mellon, 2011 WL 3269686, at *9 (D. Mass. July 28, 2011); see also

9

Morris v. BAC Home Loan Servicing, L.P., 775 F. Supp. 2d 255, 263 (D. Mass. 2011) (explaining that "not every technical violation of HAMP should expose a servicer to Chapter 93A liability"). For example, plaintiffs have successfully survived the motion to dismiss stage when they alleged a pattern or course of conduct involving misrepresentations, delay, and evasiveness in evaluating a HAMP application. See, e.g., Hannigan v. Bank of America, N.A., ___ F. Supp. 3d ___, 2014 WL 4783635, at *6 (D. Mass. Sept. 24, 2014) (denying motion to dismiss when "plaintiffs applied numerous times for a modification under HAMP and . . . Bank of America repeatedly required that they re-submit information that they had previously provided"); Charest v. Fed. Nat'l Mortg. Assoc., ___ F. Supp. 2d ___, 2014 WL 1304232, at *7 (D. Mass. Mar. 27, 2014) (denying motion to dismiss when the loan servicer "required unnecessary information and documents it already possessed, miscalculated [applicant's] income, repeatedly misrepresented the [applicant's] eligibility for a loan modification and denied applications based on incorrect facts"); Okoye, 2011 WL 3269686, at *9 (observing that "[t]he few Chapter 93A claims that have survived motions to dismiss have alleged a pattern of misrepresentations, failure to correct detrimental errors, and/or dilatory conduct on the part of the servicer and/or bank").

    Morris is especially helpful in illustrating the fine line

between a technical violation of HAMP and a Chapter 93A violation. When the Morris plaintiffs filed their initial complaint, they merely alleged that their loan servicer did not "timely provide the appropriate notifications" and offered "a non-HAMP modification agreement." 775 F. Supp. 2d at 263. The Court found that these allegations did not demonstrate "unfairness, as opposed to minor delay or trivial clerical flaws." Id. (emphasis added). At the hearing, however, the plaintiffs further alleged that their loan servicer "had a history of being nonresponsive to the plaintiffs' efforts to obtain a loan modification, and that a prior effort had yielded higher monthly payments, an error that [the loan servicer] made little or no effort to fix." Id. As a result, the Court granted leave for the plaintiffs to amend their complaint to explain how their loan servicer had "unfairly disregarded and mishandled" their HAMP application. Id.

With these principles in mind, the Court finds that Hanrahran has sufficiently alleged unfair or deceptive conduct committed by SLS. According to the amended complaint, Hanrahran twice sent in all of the necessary paperwork to start the HAMP process–once in October 2012 and again in February 2014–and she also was eligible for a reduction in monthly payments based on the status of her loan and her income. The first time, Hanrahran did not hear back from SLS until June 2013, seven months after

11

SLS acknowledged receipt of her application. Even then, the June 2013 communication merely discussed the National Mortgage Settlement modification option and was silent as to the status of her HAMP application. Hanrahran further alleges that SLS's misdirection did not cease when she filed a second loan modification application in 2014. This time, SLS denied her HAMP request, but on false pretenses. SLS claimed that certain documents were missing from her application, which was not true. SLS also claimed that it sent her notice of the missing documents, which was also not true.

    Taken as a whole and in the light most favorable to Hanrahran, SLS's actions here amount to more than a minor delay or clerical error HAMP-ering Hanrahran's efforts to obtain a loan modification. To the contrary, SLS failed to respond to Hanrahran's HAMP application for almost twenty months, despite repeated requests to do so. And when they finally rejected her application, they did so for doubly dubious reasons, falsely stating that she was missing documents and failed to respond to one of their notices. Meanwhile, SLS continued to refer Hanrahran to foreclosure and pile on fees and costs as she was strung along for more than a year and a half. Although none of these actions might amount to a Chapter 93A violation on their own, "the relevant conduct is the entirety of defendants' actions, not each action viewed in isolation." Hannigan, 2014 WL 4783635, at * 6.

As a result, the Court finds that the amended complaint's allegations of repeated delay, evasion, and misrepresentation sufficiently allege an unfair or deceptive business practice for purposes of Chapter 93A.

**B. Economic Injury**

SLS next argues that Hanrahran's amended complaint fails to sufficiently plead economic injury. But this argument fares no better than the last one.

Despite some remaining "tension" between earlier and later SJC decisions, Massachusetts courts now generally "have returned to the notion that injury under chapter 93A means economic injury in the traditional sense." Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 255 (1st Cir. 2010). As a result, "merely proving an unfair or deceptive act by the defendant directed at the consumer" is likely insufficient to establish injury to that consumer. Id. at 254. Instead, "the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Tyler v. Michaels Stores, Inc., 984 N.E.2d 737, 745 (Mass. 2013). In the home loan modification context, for example, the First Circuit recently upheld a Chapter 93A claim where the plaintiff alleged that the bank's "repeated mistakes during the forbearance and loan modification process subjected her to loss of equity in her home and damage to her credit ratings." Young, 717 F.3d at 241.

13

The plaintiff must merely show that the defendant's conduct placed her "in a worse and more untenable position than she would have been had defendants dealt with her appropriately during this period of time." Id. (quoting Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 840 N.E.2d 526, 534 (2006) (alterations omitted)).

Hanrahran's amended complaint satisfies this standard by alleging a separate, identifiable harm arising from SLS's actions. Hanrahran alleges that she currently faces higher monthly payments than she would have been required to pay if SLS had fairly evaluated her application because she qualifies for HAMP relief. She also has suffered an accumulation of interest, damage to her credit, and assessment of late payment charges-costs that she would not have suffered if SLS had granted her HAMP relief or at least denied her application on a timely basis so that she could pursue alternative remedies. See Dill, 935 F. Supp. 2d at 306 (denying motion to dismiss HAMP-based chapter 93A claim where plaintiffs "sufficiently allege damages, such as fees incurred to avoid foreclosure and harm to [their] credit"); Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 354 (D. Mass. 2011) (defendant pleaded several injures "including wrongful foreclosures, increased fees, costs incurred to avoid foreclosure, loss of opportunities to pursue refinancing or loss mitigation strategies, and emotional distress"). Hanrahran's

14

allegations of economic injury are therefore sufficient to state a plausible Chapter 93A claim.

### IV. ORDER

Defendant's Motion to Dismiss the Amended Complaint (Docket No. 23) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge